UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

AMILCAR RAMOS

                Plaintiff,              Civil Action No. 1:09-cv-00453-WMS-JJM

      -v-

CARL LUNDIN,

BUFFALO POLICE
DEPARTMENT,

CITY OF BUFFALO,

BYRON BROWN,

MCCARTHY GIPSON,

                Defendants.
_____

## SECOND AMENDED COMPLAINT

### Introduction

1. This action is brought pursuant to 42 U.S. Code §1983 by way of violating the Fourth Amendment to the U.S. Constitution.

### JURISDICTION AND VENUE

2. This Court has jurisdiction over the Plaintiff's federal claims pursuant to 28 U.S.C. §1331 as an action raising a federal question; pursuant to 28 U.S.C. § 1343(3) as an action to redress a deprivation under color of state law of rights secured by the Constitution of the United States.

3. Venue lies in the Western District of New York pursuant to 28 U.S.C. § 1391(b)(2) as the judicial district in which the events occurred that gave rise to Plaintiff's causes of action.

### PARTIES

4. Plaintiff Amilcar Ramos is real and natural person who, at the time of the acts alleged in this complaint, resided in the City of Buffalo.

5. Defendant Carl Lundin was, at the time of the acts alleged in this complaint, a police officer employed by the Buffalo City Police Department.

6. Defendant Buffalo Police Department is the police department for the City of Buffalo, NY.

7. Defendant Byron Brown became the mayor of Buffalo in 2006. As of this complaint, he is still the mayor of Buffalo.

8. Defendant McCarthy Gipson was named police commissioner of the Buffalo Police Department shortly after Mayor Brown took office. He was replaced in 2010 by Daniel Deranda.

## FACTUAL ALLEGATIONS

9. On August 30, 2007 Mr. Ramos was seated in the back seat of a vehicle which contained two other individuals (including the driver of the vehicle).

10. The vehicle (hereinafter "vehicle") which Mr. Ramos was riding in was ordered to stop by officers Carl Lundin and Thomas Sercu, police officers employed by the Buffalo Police Department, and riding in a police vehicle. (hereinafter "police vehicle).

11. The vehicle was eventually entrapped by the police vehicle in a driveway at 124 Grote Street, Buffalo, NY.

12. At that time, an individual seated in the front passenger seat exited the car, and fled. Officer Sercu gave chase.

13. While Mr. Ramos was still a passenger in the vehicle, the driver of the vehicle put the car in reverse, and attempted to drive away.

14. Officer Lundin fired into the back of vehicle, striking Mr. Ramos in his left shoulder.

## COUNT I: §1983 claim against officer Carl Lundin

15. Although the vehicle containing Mr. Ramos was disobeying police orders by attempting to drive away, there was no indication that the vehicle, the driver, or Mr. Ramos posed an *immediate risk* to any other person.

16. Officer Lundin's decision to fire at the escaping vehicle was reckless and posed an unreasonable risk of injury to Mr. Ramos.

17. As such, officer Lundin's use of force was not "objectively reasonable" pursuant to the appropriate legal standards.

18. As a direct result of officer Lundin's excessive force, Mr. Ramos suffered physical injury to his left shoulder, and became nervous, upset and anxious regarding both the physical injury he sustained, and the Constitutional deprivation he suffered.

**COUNT II: §1983 Claim against City of Buffalo, Buffalo Police Department, Byron Brown and McCarthy Gipson**

19. As established below in paragraphs 20-26, the Buffalo Police Department and the City of Buffalo (under the leadership of Byron Brown and McCarthy Gipson) have established a custom of encouraging aggressive policing, with deliberate indifference to the civil rights of city residents.

20. Under the leadership of Buffalo Mayor Byron Brown, the Buffalo Police Department has fostered a "broken windows"[1] style of policing wherein police are encouraged to aggressively intrude into the lives of citizens suspected of no crime, or relatively minor crimes. Civil rights concerns do not meaningfully enter this equation.

    i. During his initial mayoral campaign, Byron Brown implemented what he referred to as an "aggressive Zero Tolerance law enforcement plan that targeted quality of life crimes throughout the City of Buffalo." He noted the plan was designed to make policing in the city "more proactive." Shortly after he was elected Mayor, he implemented this plan, which he described as targeting three "key areas": street level drug activity; graffiti; vandalism; and excessive noise disturbances. Under the Action Plan, then Police Commissioner Gipson was "directed to meet with the Department's chiefs and brief them on their respective responsibilities, including providing the chiefs with *specific goals and measurable statistical objectives*." Police officers would not only be

---

[1] *See* Kelling, George and Wilson, James, *Broken Windows: The police and neighborhood safety*, THE ATLANTIC MONTHLY, March 1982, available online at http://www.theatlantic.com/magazine/archive/1982/03/broken-windows/304465/ (last visited July 20, 2015).

community police officers charged with responding to the needs of the residents they served, but would be "expected to focus on specific Zero Tolerance anti-crime tasks."[2]

ii. In 2009, Mayor Brown touted the success of his initiatives, noting that more than 108 police officers had been added to the Department, and alleged that crime rates had dropped since implementation of the Zero Tolerance anti-crime agenda. At that time, Mr. Brown doubled down on his Zero Tolerance agenda, adding coordinated bike and foot patrol details with the goal of making police officers more visible throughout the city.[3]

iii. Mayor Brown's aggressive policing agenda persists to this day. In November of 2014, Buffalo Police Commissioner Daniel Deranda admitted that while the Buffalo Police Department does not actively employ a "stop and frisk"[4] policy, that he was sure that Buffalo police officers engaged in this practice. If the practice were considered against protocol, one would not expect his casual acceptance of the practice. John Lipsits, an attorney representing the local chapter of the National Lawyers Guild, noted at the time that the "current

---

[2] *See Mayor Brown Announces Zero Tolerance Plan*, available online at: https://www.ci.buffalo.ny.us/Home/Leadership/Mayor/Archive_Press_Releases/2006_Archives/March_2006/MayorBrownAnnouncesZeroTolerancePlan (Last visited July 21, 2015). A copy of the plan itself can also be found online at: http://www.city-buffalo.com/Home/Leadership/Mayor/Mayor_s_Plans_and_Proposals/LawEnforcementActionPlan (Last visited July 21, 2015).

[3] Mayor Brown Announces Enhanced Police Foot & Bicycle Patrols, available online at: http://www.bpdny.org/Home/Press/2009/EnhancedFootAndBikePatrols (last visited July 21, 2015).

[4] A brief, non-intrusive, police stop of a suspect. The Fourth Amendment requires that the police have a reasonable suspicion that a crime has been, is being, or is about to be committed before stopping a suspect. If the police reasonably suspect the person is armed and dangerous, they may conduct a frisk, a quick pat-down of the person's outer clothing. *See Terry v Ohio*, 392 US 1, (1967). Systematic "stop and frisk" policing has been deemed unconstitutional. *Floyd v. City of New York*, 959 F.Supp 2d 540 (S.D.N.Y. 2013).

prevalence of reports of unjustified stops and ticketing by Buffalo Police Department is unacceptable."[5]

21. Residents of the City of Buffalo have explicitly complained about the Brown Administration's failure to implement a less hostile police force, and have linked that failure to violations of civil rights. In a letter to the executive director of the Buffalo Municipal Housing Authority (BMHA), the president of the Jurisdiction-Wide Resident Council challenged that the Buffalo Police Department had not followed through on promises to use community policing.[6] Moreover, the president further stated that:

> BPD has implemented police practices that create a pattern and practice of unlawful stops and false arrests. Many residents have been falsely accused of trespassing for doing nothing more than walking to or from their apartments. Some residents have even been arrested for trespassing in their own homes[7]

The Buffalo News has also noted that "[BMHA] [t]enant leaders say they and visitors are routinely stopped by Buffalo police for no good reason."[8]

22. Buffalo Police officials appear aware that the broken windows policing tactics they have encouraged result in increased use of force by their officers. For example, from January 1, 2011 through September 2014, Buffalo Police shot 92 dogs. 73 of those dogs died. That number is more than triple the amount killed by police officers in Cincinnati, OH a city of similar size to Buffalo, NY. New

---

[5] Wooten, Michael, Buffalo's top cop admits police have used "stop and frisk," WGRZ.com, November 5, 2014, available at http://www.wgrz.com/story/news/crime/2014/11/05/buffalo-police-stop-and-frisk-bmha/18542949/.

[6] Community policing is a philosophy that promotes organizational strategies that support the systematic use of partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime. *See* http://www.cops.usdoj.gov/pdf/vets-to-cops/e030917193-CP-Defined.pdf (last accessed July 20, 2015). It is often referred to as an alternative to broken windows policing.

[7] *Poverty, Race, and Community Policing in Buffalo*, Partnership For The Public Good, Policy Brief, available online at http://www.ppgbuffalo.org/wp-content/uploads/2013/03/Community-Policing.pdf (last visited July 21, 2015).

[8] Watson, Rod, *Buffalo Municipal Housing Authority needs to hire its own police force*, THE BUFFALO NEWS, December 17, 2014, available online at: http://www.buffalonews.com/columns/rod-watson/buffalo-municipal-housing-authority-needs-to-hire-its-own-police-force-20141217 (last visited July 21, 2015).

York City, the largest city in the U.S., reported killing half as many dogs as the Buffalo Police Department. In the course of defending themselves in the media, police officials noted the enormous number of interactions between Buffalo police and residents, an intended consequence of broken windows policing.[9]

23. Mayor Brown's broken windows police policy has predictably resulted in staggering racial disparities with regards to the manner in which the Buffalo Police Department arrests members of the Community.[10]

24. The Buffalo Police Department has tacitly encouraged its police officers to use excessive force by promulgating a list[11] of duties citizens are to adhere to when they engage with police officers to "lessen the unpleasantness" of interaction with police officers. The Police Department further asked Buffalo Citizens to "bear in mind" that law enforcement officers can be stressed out, vulnerable, and in danger during traffic stops.

    a. Some of these requests appear to assume that their officers will be improperly trained, and prone to retaliate for legitimate and constitutionally protected behavior by citizens. For example, the Police Department orders Buffalo citizens to refrain from arguing with a police officer. Another guideline directs citizens to confess to traffic violations.

    b. The overarching thrust of the list of directives is undeniably that citizens have some sort of duty to prevent stressed, vulnerable police officers from responding to their actions with escalation and perhaps even violence.

    c. A reasonable police officer would respond to such a directive and perceive that the city understands that his or her job is dangerous, and that citizens share an equal duty in preventing excessive use of force.

---

[9] Spewak, Danny and Blarr, Megan, *Collateral Damage: Police shooting dogs in line of duty*, WGRZ, available online at http://www.wgrz.com/longform/news/local/buffalo/2014/11/14/buffalo-pd-dog-shootings/19012631/ (last visited July 20, 2015).

[10] *See* Michel, Lou, *Racial disparities found in marijuana charges*, THE BUFFALO NEWS, June 7, 2013, available online at: http://www.buffalonews.com/20130607/racial_disparities_found_in_marijuana_charges.html (last visited July 21, 2015); *see also supra*, n. 7.

[11] *See What To Do When Stopped By The Police*, available online at: http://www.bpdny.org/Home/Community/WhatToDoWhenStoppedByThePolice (last visited July 21, 2015).

25. It is further noted that, upon information and belief, the Buffalo Police Department's official policy is that members of its department "may use deadly physical force but only when it is necessary to defend the Officer or third person from what the Officer reasonably believes to be the use or imminent use of deadly physical force."[12] Such a vague policy does little to discourage the use of excessive force and reckless violence by police officers in light of the city's push for its officers to become more aggressive and make more arrests.

26. The city's actions after officer Lundin shot Mr. Ramos also speak volumes as to how seriously it treats use of excessive force. Despite the fact that officer Ludin had been involved in shooting Mr. Ramos, and that no witness interviewed by the police department specifically adopted Mr. Lundin's version of events, Mr. Lundin was promoted to detective in 2008.[13]

27. Further, The Buffalo News has documented what it refers to as a "culture of misconduct" within the Buffalo Police Department since Byron W. Brown became mayor in 2006.[14] Numerous examples are cited in the article, and ex-police officials, as well as experts in the field of policing, are cited in support of the article's thesis.

28. The broken windows policies of Mayor Brown referenced in paragraphs 20-26, as well as the culture of misconduct referenced in paragraph 26, represent an official policy or custom of the City of Buffalo, and the Buffalo Police Department. This policy or custom directly caused Mr. Ramos' constitutional deprivation, as alleged in paragraphs 9-18.

**RELIEF REQUESTED**

WHEREFORE, plaintiff demands judgment against each of the Defendants for :

---

[12] Plaintiff bases this belief off of what appears to be a leaked copy of a copy of the Buffalo Police Department's use of force policy, available online at: https://www.scribd.com/doc/96122329/Buffalo-PD-Use-of-Force-Policy (last visited July 21, 2015).

[13] *See BPD promote twelve* , available online at: http://www.bpdny.org/home/press/2008/sixnamedtodetective (last visited July 21, 2015).

[14] *See* Spina, Matthew, *Culture of miscounduct in Buffalo Police Department has existed for years: "Culture of misconduct" is blamed on superiors*, THE BUFFALO NEWS, May 24, 2014.

A. Actual and compensatory damages.

B. Punitive damages.

C. Costs and attorney's fees 42 U.S.C.§1988.

D. Award such other and further relief that seems just and proper.

**A JURY TRIAL IS DEMANDED ON ALL ISSUES AND ON ALL COUNTS IN THE COMPLAINT.**

Dated: July 21, 2015 /s/ Timothy Hiller, Esq.
Timothy Hiller, Esq.
Law Office of Kenneth Hiller
*Attorneys for the Plaintiff*
6000 North Bailey Avenue, Ste. 1A
Amherst, NY 14226
(716) 564-3288
Email: thiller@kennethhiller.com